CHARLES D. SCHLECHTY AND MARY E. SCHLECHTY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schlechty v. Commissioner
Docket No. 20143-89.
United States Tax Court
T.C. Memo 1992-115; 1992 Tax Ct. Memo LEXIS 136; 63 T.C.M. (CCH) 2194; T.C.M. (RIA) 92115; February 25, 1992, Filed *136 Decision will be entered for respondent. Mark E. Gammons, for petitioners. Dawn M. Krause, for respondent. PETERSON
PETERSON
MEMORANDUM FINDINGS OF FACT AND OPINION PETERSON, Chief Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 182. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined a deficiency in petitioners' income tax, increased interest, and additions to tax as follows: Additions to Tax and
Year
Deficiency
Increased Interest
1985
$ 5,725
Sec. 6653(a)(1)
$ 286.25
Sec. 6653(a)(2) [1]
Sec. 6621(c)
Applicable
Sec. 6661
1,431.25
After concessions by petitioners, the issues remaining for decision are: (1) Whether petitioners are entitled to a deduction under section 165(c)(2) for cash expenditures made for an investment which was an economic *137 sham; and (2) whether petitioners are liable for additions to tax pursuant to sections 6653(a) and 6661, and for increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners resided in Chippewa Lake, Ohio, when the petition in this case was filed. During 1981, Structured Shelters, Inc. (SSI), marketed an investment entitled Children's Classic Series (1981 Record Promotion). This promotion involved the leasing of master recordings of children's stories for the purpose of producing record albums, described in detail in . SSI used sales agents, called Chartered Representatives, to market various tax-motivated investments, including the 1981 Record Promotion. Thomas A. Graham (Mr. Graham) was a Chartered Representative of SSI. The master recordings used in the Children's Classic Series were purchased by Oxford Productions (Oxford) for $ 454,120. The purchase agreement required a cash payment in the amount of $ 7,000 and the execution of a nonrecourse *138 note in the amount of $ 447,120. The cost to produce each master recording was $ 1,635.50. Oxford leased the master recordings to investors of the 1981 Record Promotion for an 8-year term. The lease required an advance rental payment of $ 10,000 in cash plus 25 percent of all gross revenues during the lease period. A part of the 1981 Record Promotion included a distribution agreement between the investors and Aim Record Distribution (Aim) which provided that Aim would produce and market the records. The investors agreed to pay Aim $ 2,500 cash plus 10 percent of the gross receipts from record sales. Of the $ 2,500 payment, 15 percent was allocated to the cost of producing the record album jacket. Aim developed artwork for the album jackets for the 1981 Record Promotion investors. During 1984, SSI, on behalf of the 1981 Record Promotion investors, sold the rights to reproduce the artwork and to use the titles of the record albums to Sonya, Inc. (Sonya), for $ 100,000 for each title. The purchase price consisted of a cash payment of $ 10,000 and the assumption of a $ 6,000 note, and the balance of $ 84,000 was payable from future sales of children's cassette tapes. The $ 100,000 *139 sales price was an arbitrary figure which had no relationship to the value of the right to use the titles sold to Sonya. Neither SSI nor the 1981 Record Promotion investors had the exclusive rights to the record titles or to the artwork sold to Sonya. Graham and his spouse owned 65 percent of the stock in Sonya. During 1984, SSI and Graham began to market an investment called Children's Classics Audio Cassettes (CCAC). There were two phases to this program. The first phase involved the production of master recordings (CCAC Production Phase) using the titles and artwork purchased by Sonya from the 1981 Record Promotion investors. The second phase involved leasing the master recordings (CCAC Lease Phase) from the CCAC Production Phase investors to produce cassette tapes. An integral part of the scheme was Sonya's sale in December 1984 to the CCAC Production Phase investors (1984 CCAC Production Phase) of the right to reproduce the artwork and to use the record titles which it had purchased from the 1981 Record Promotion investors. The sales price was $ 103,000 for each title. The sales agreement required a cash payment of $ 13,000 with the balance due of $ 90,000 to be paid *140 within 5 years from future sales of cassette tapes. Each CCAC Production Phase investor entered into an agreement with Skeets Music (Skeets) under which Skeets agreed to produce the master recordings and artwork for $ 20,000, of which $ 5,000 was paid in cash and the balance was to be paid from future sales of cassette tapes. Also, a marketing agreement was entered into with Marketing Complex, Inc. (MCI), to develop an advertising plan for the cassette tapes. The investors agreed to pay MCI $ 7,500, of which $ 1,500 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1984, the CCAC Production Phase investors leased to the CCAC Lease Phase investors (1984 Lease Phase) the right to produce cassette tapes from the master recordings developed for the 1984 CCAC Production Phase investors. The lease was for a term of 5 years and required the lessee to pay $ 1 each for a minimum of 10,000 tapes. A cash payment of $ 2,500 was paid and the balance of $ 7,500 was due in 5 years. The 1984 CCAC Lease Phase investors entered into an agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 7,500, of which $ *141 1,500 was paid in cash and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1985, Sonya sold additional record titles and artwork to CCAC Production Phase investors (CCAC 1985 Production Phase) for $ 115,000 per title. The agreement provided for a cash payment of $ 25,000 with the remaining balance due of $ 90,000 to be paid within 5 years from the future sales of cassette tapes. Included in the sale price was the production cost of $ 5,000 which Sonya paid directly to Skeets. None of the investors entered into production agreements to produce master recordings. The 1985 CCAC Production Phase investors entered into an advertising agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 7,500, of which $ 1,500 was paid in cash and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1985, the CCAC 1984 and 1985 Production Phase investors leased to the CCAC Lease Phase investors (1985 CCAC Lease Phase investors) the right to produce cassette tapes from the master recordings purportedly developed for the 1984 and 1985 CCAC Production Phase investors. The lease was for a period of 5 years *142 and required the lessee to pay $ 1.67 each for a minimum of 10,000 tapes. A cash payment of $ 4,175 was paid and the balance of $ 12,525 was to be paid from future sales of cassette tapes during the term of the lease. The 1985 Lease Phase investors entered into an agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 8,000, of which $ 2,000 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. The cassette tapes and artwork were primitive, of very poor quality, and clearly substandard to cassette tapes sold in the customary retail market. As of the date of trial, there had been no sales of such cassette tapes. Because of their poor quality, it was highly unlikely that there would ever be a market for cassettes tapes produced from the master recordings leased by the investors. Under these circumstances the master recordings, leases, and artwork had no commercial value. The total amount of cash invested by the 1984 CCAC Production Phase investors was $ 19,500 for each master recording. The total amount of projected tax benefits for each investor was between $ 115,000 and $ 119,000. The total amount of *143 cash invested by the 1985 CCAC Production Phase investors was $ 27,000 for each master recording. The total amount of projected tax benefits for each investor was $ 126,300. The total amount of cash invested by the 1984 CCAC Lease Phase investors was $ 4,000 for each lease. The total amount of projected tax benefits for each investor was $ 17,500. The total amount of cash invested by the 1985 CCAC Lease Phase investors was $ 6,175 for each lease. The total amount of projected tax benefits for each investor was $ 24,700. During 1985, petitioner Charles D. Schlechty (hereinafter petitioner) entered into an agreement with the CCAC Production Phase investors to lease for $ 16,700 the rights to produce cassette tapes from the master recording entitled "Intriguing Animal Stories". Under the 1985 CCAC Lease Phase program, petitioner made a cash payment of $ 6,175 and expected to receive tax deductions in the amount of approximately $ 25,000 for his investment in the master recording lease. For the year 1985, petitioners claimed a deduction of $ 25,956 on their tax return, which related to the master recording investment. At the time of the investment in the master recording lease, *144 petitioner had no background or knowledge of the record or tape cassette business. Petitioner did not make any investigation concerning the nature or the profitability of the CCAC investments and accepted at face value Mr. Graham's statement that the CCAC investment would provide petitioner with a good investment. Petitioner failed to review the various documents he signed and did not negotiate any of the contract terms. Petitioner did not investigate the experience or the financial background of any of the entities involved in the CCAC transactions to determine whether such entities had the capability to produce and distribute cassette tapes in the retail market. Petitioner made no attempt to obtain an appraisal of the master recording, or the lease, or make any other investigation to determine its value. Petitioner made no attempt either to verify Mr. Graham's tax advice with an independent tax authority, or to verify whether Mr. Graham had any experience in the recording business or was knowledgeable in investment or tax matters. Petitioner has no experience in tax matters. Petitioner's decision to invest in the 1985 CCAC Lease Phase was not based on a profit motive, but *145 on the promised tax benefits. OPINION Petitioners admit that the investments made in the 1984 CCAC Lease Phase had no economic substance and agree that they are not entitled to any tax credits or deductions based on these investments. However, petitioners contend that they are entitled to deduct the cash payments made for their investments under section 165(c)(2) on the ground that the losses were incurred in a transaction entered into for profit. Although admitting that the transaction was an economic sham, petitioners contend that petitioner had no knowledge at the time he entered into the transaction that the investment lacked economic substance. Petitioners argue that tax motivation was incidental to the CCAC investments because petitioner felt that the investment would have a 20-to-1 return from the sale of cassette tapes without regard to the tax benefits. Further, petitioners argue that because of the lack of knowledge of petitioner in investments and tax planning, it is clear that he relied on the reputation of Mr. Graham, as an expert in investment matters, that there would be substantial earnings and profits from the sale of cassette tapes. Respondent argues that *146 petitioners have failed to show that a loss was sustained, or the amount of any loss as required under section 165(c)(2). In addition, respondent contends that petitioners have failed to show that Charles Schlechty had a profit motive when he entered into the CCAC transaction. The transaction involved in the instant case is a continuation of the tax shelter promotion scheme by SSI concerning master recordings of children's records described in detail in . In the original 1981 promotion, which the Court found was an economic sham, the investors produced master recordings for the alleged purpose of producing and distributing records in the children's retail market. In the instant case petitioner acquired the right to lease a master recording from CCAC Production Phase investors to produce cassette tapes. The facts in this case are essentially the same as set forth in The only material difference is that in the instant case petitioner acquired a lease of a master recording which had been acquired through SSI to produce children's cassette tapes. Petitioners admit that *147 the transaction was without economic substance the same as in the Rybak case. Because of petitioners' admission that the transaction lacked economic substance, petitioners cannot prevail notwithstanding their subjective profit motive. See , where we held that the presence of an individual's subjective profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance. In , we denied a deduction for "out of pocket cash losses" on the ground that the transaction lacked economic substance and stated that subjective intent of a profit cannot supply economic substance to a business transaction. Also, in , affg. , the court concluded, as an alternative basis for its holding that the deductions claimed were not deductible, that where there is a clear finding of a lack of economic substance it is enough, standing alone, to support a decision that a deduction is not allowable. In , *148 affg. , the Court of Appeals held that if a transaction is a complete sham, then such niceties as whether the test (for whether a transaction is "entered into for profit") is an objective or subjective one are simply not involved. Regardless of the definition, the transaction must be bona fide before losses are deductible. For the above reasons, we sustain respondent's determination that petitioners are not entitled to loss deductions or tax credits for the year 1985 for the cash payment invested in the CCAC transaction under section 165(c)(2) because the transaction lacked economic substance and was not entered into for profit. Additions to Tax
Respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a *149 reasonable and ordinarily prudent person would do under the circumstances. . Petitioners contend that they were not negligent because petitioner placed his reliance completely on Mr. Graham, the sales representative of SSI, who he felt had a good reputation in tax and investment matters. We agree that reliance on the advice of professionals may defeat a finding of negligence under certain circumstances. . See . Petitioners have the burden of proof to show that they were not negligent. . There is no evidence in this record that Mr. Graham had any experience in the record or cassette tape recording business. Petitioners made no attempt to personally verify whether Mr. Graham had any such experience, or whether he was knowledgeable in investment and tax matters. Petitioner testified that he relied on Mr. Graham's reputation when they entered into the transaction. However, he failed to *150 explain the basis for his complete faith in Mr. Graham's reputation. Apparently, petitioner did not see any conflict in the fact that Mr. Graham had a financial interest in the transaction. Under these circumstances, reasonable caution dictates that further inquiry be made to verify the accuracy of the tax and investment information received. We do not believe that petitioner would have committed approximately $ 25,000 to this transaction without seeking independent advice if he were truly concerned about his investment, other than for the tax benefits involved. We find no evidence that petitioner's actions were prudent or reasonable under the circumstances of this case. Accordingly, petitioners are liable for the additions to tax for negligence as determined by respondent. Section 6661
Respondent has also determined that the addition to tax under section 6661 applies in this case. Petitioners do not dispute that there was an understatement of income tax as defined in section 6661, but argue that the addition to tax should be waived on the ground that petitioners had reasonable cause for the understatement and made the investment in good faith. Respondent contends that *151 the deductions claimed on petitioners' return are attributable to a tax shelter and that petitioners are liable for the addition to tax since they have failed to show that there was substantial authority for their position and that they reasonably believed their tax treatment of the items was more likely than not the proper treatment. We agree with respondent. Sec. 6661(b)(2)(C)(i). We also agree with respondent that petitioners have failed to show that respondent abused his authority in not waiving the addition to tax. . There is no showing of reasonable cause by petitioners for the understatement and that they acted in good faith. To the contrary, we have found that petitioners were negligent in claiming the deductions and credit and failed to make a good faith effort to determine the proper tax treatment of the tax items involved. See Increased Interest
Petitioners contest the increased interest under section 6621(c) on the ground that petitioner intended to make a profit on the transaction. We have concluded that the deductions and credit *152 were not allowable because the transaction lacked economic substance and was tax motivated. Transactions which lack economic substance or business purpose are sham transactions under section 6621(c)(3)(A)(v). ; , affd. without published opinion sub nom. , affd. sub nom. , affd. without published opinion , affd. sub nom. . Accordingly, petitioners are liable for the increased interest as determined by respondent. Decision will be entered for respondent. Footnotes
1. 50 percent of the interest due on $ 5,725.↩